UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| REBECCA RAGSDALE, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | CAUSE NO. 3:18-CV-183-PPS |
|  | ) |  |
| BEACON HEALTH SYSTEMS, INC. | ) |  |
|  | ) |  |
| Defendant. | ) |  |

# OPINION AND ORDER

Plaintiff Rebecca Ragsdale brings a claim under the Family and Medical Leave Act against her former employer, Beacon Health. After she took a 4-day FMLA leave to take care of her father, Ragsdale claims she was denied a promotion, was treated negatively by her boss, and was harassed to the point that she was constructively discharged. But viewing the evidence in the light most favorable to Ragsdale, Beacon is entitled to judgment as a matter of law. Her theory that she didn't get a promotion because she took FMLA leave is a nonstarter because the decision maker wasn't even aware that she had taken the leave. And Ragsdale's constructive discharge claim has to be dismissed because she has not come close to presenting sufficient evidence that her working conditions were deplorable and that she had no other choice but to resign. I will therefore grant summary judgment.

## Motion to Strike

Before addressing the motion for summary judgment, I will first turn my attention to Beacon's motion to strike which was not responded to by Ragsdale. [DE 42.]

Beacon moves to strike several hearsay statements Ragsdale sets forth in her response. [DE 43 at 3-4.] On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 WL 791384, at *2 (N.D. Ill. Feb. 24, 2015); *see also Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) (same). Here, Beacon is trying to preclude statements of its own employees — Steve Eller, Chad Hartzell, Judy Finkler, and an HR representative — from being relied upon by Ragsdale. But these statements would certainly be admissible at trial — they are statements of a party opponent made in a "representative capacity." Fed. R. Evid. 801(d)(2)(A). They won't be stricken.

Beacon also moves to strike three statements in Ragsdale's response that don't cite to any evidence, and are instead legal arguments and conclusory allegations. [DE 43 at 5.] Of course the rules require a party to support each fact with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence. Fed. R. Civ. P. 56(c)(1); N.D. Ind. L.R. 56-1. However, motions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party. *Kuntzman v. Wal-Mart*, 673 F.Supp.2d 690, 695 (N.D. Ind. 2009); *Gaskin v. Sharp Elec. Corp.*, No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind.

July 30, 2007). Furthermore, it is the function of this Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement. *See, e.g., S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 392 (S.D.N.Y. 2006); *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, No. 04 C 5167, 05 C 2253, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2016); *Tibbetts v. RadioShack Corp.*, No. 03 C 2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F.Supp.2d 917, 920 n.1 (N.D. Ind. 2004).

In this case, I have sifted through all of the evidence and considered it under the applicable federal rules, giving each piece the credit to which it is due. Accordingly, the motion to strike [DE 42] is denied.

## Motion for Summary Judgment

### Undisputed Facts

The following are the undisputed material facts as set forth by the parties. Beacon employs approximately 7,000 people and provides various health care services to citizens of Northern Indiana, including child birth, mental health, cancer, pediatric, trauma, heart and vascular care, and community health programs. [Eller Decl., DE 33-1 at 1.] Beacon has an Equal Opportunity Policy and an Anti-Harassment Policy, as well as a Leave of Absence Policy encompassing leave taken under the FMLA.

Plaintiff Ragsdale was hired by Beacon in March 2014 as a Human Resources Business Partner. She directly reported to the Associate and Labor Relations Manager,

3

Judy Finkler. [Ragsdale Dep., DE 33-2 at 47-48, 50.] Ragsdale worked on a variety of human resources-related issues, including developing and presenting training and giving guidance to business units, managers, and associates on HR issues.

Before the FMLA leave at issue in this case, Ragsdale had previously taken off a week from work to care for her father in 2015. During that instance, she left work quickly to respond to an emergency with her father. [DE 32-2 at 68.] When she returned to the office a week later, Ragsdale asked Finkler if she needed to apply for FMLA to cover her time out, and Finkler responded that wasn't necessary. [*Id.*]

Ragsdale's father continued to be in poor health, and around July 21, 2016, Ragsdale completed FMLA paperwork requesting four days off of work to care for her dad who was having surgery. [DE 33-2 at 64-65.] The request was granted, Ragsdale took the leave from August 2nd through August 5th, and she returned to work on August 8, 2016. [*Id.*] Thereafter, Finkler and Ragsdale's relationship went south; they were oil and water. If one believes Ragsdale, which I must at this point, Finkler's response to Ragsdale's FMLA request was surprising especially coming from an HR specialist. According to Ragsdale, Finkler "was pissed" when Ragsdale requested the leave. [*Id.* at 68.] Finkler said, "what is this about?" [*Id.*] Ragsdale thought she was upset because Finkler was supposed to be on vacation around that same time. [DE 39-1 at 71, 101.]

The day after Ragsdale returned to work after her 4-day FMLA leave, on August 9, 2016, Executive Director Chad Hartzell met with Ragsdale in person to tell her she

4

had not been selected for the Manager of Recruiting position. [DE 33-2 at 82-83.] This position was created in the summer and posted on July 8, 2016. [Hartzell Decl., DE 33-4 at ¶¶ 3-4.] Ragsdale was one of three internal candidates who applied for and interviewed for this position. [*Id.* at ¶ 5.] When the position was posted, Hartzell identified Joseph Murray as the preferred candidate because he had the most relevant experience. [*Id.* at ¶ 6.] While Ragsdale had a little more seniority than Murray, Hartzell said seniority had no bearing on his hiring decision, and he hired Murray because he had years of healthcare specific recruiting experience, including serving in a managerial role over healthcare recruiting. [*Id.* at ¶¶ 6-7.] Hartzell decided not to hire Ragsdale because he determined she was not the most qualified applicant. [*Id.* at ¶ 8.] Ragsdale admits that Murray was qualified for the position, but believes she was the most qualified candidate because of her seniority. [DE 33-2 at 85.] It is undisputed that at the time Hartzell made his hiring decision, Hartzell was unaware that Ragsdale had requested FMLA leave. [DE 33-4 at ¶ 9.]

As noted above, Ragsdale claims that after she asked for the FMLA leave, her relationship with her boss, Finkler, deteriorated. According to Ragsdale, "right when I applied for FMLA and I notified her, our relationship did a complete 180. Her behavior towards me, her actions towards me, facial expressions, the trust factor – - I mean, I had full autonomy before I applied for FMLA, and that was gone." [DE 39-1 at 101.] Ragsdale reported Finkler's behavior to Steve Eller, the Chief Human Resources Officer, and Hartzell. According to Ragsdale, her complaints fell upon deaf ears. For his part,

Hartzell viewed the problem as a personality conflict. [DE 33-4 at ¶ 11.] Eller believed "Ragsdale wanted Finkler's management position, and continued to represent her in a bad light to management for that purpose." [Eller Decl., DE 33-1 at ¶ 9.]

In June 2017, Hartzell talked with Ragsdale about the possibility of transferring her to a lateral Human Resources Business Partner position where she would not report to Finkler, with no disruption to Ragsdale's current pay or benefits. [DE 33-4 at ¶ 11; DE 33-2 at 178-79.] Hartzell believes "Ragsdale ultimately decided she was not interested in a transfer because she was planning to look for positions outside of Beacon." [DE 33-4 at ¶ 11.]

Indeed, Ragsdale concedes that she had been exploring and interviewing for other jobs since January 2017. [DE 33-2 at 204.] In June 2017, Ragsdale was contacted by Meridian Title Corporation about whether she would be interested in the Director of Human Resources position. [*Id.* at 203-04.] Ragsdale responded she was "kind of picky" and demanded a salary of at least $80,000 to $85,000 to make the move from Beacon to Meridian, stating she "wasn't going to take another pay cut . . . [and] . . . also wasn't going to take just any HR generalist position because that was not going to make [her] happy with that type of job." [*Id.* at 207-08; DE 33-3 at 30-31.] Ragsdale interviewed at Meridian earlier in the morning on the same day Hartzell offered her the lateral position within Beacon. [DE 33-2 at 206-07, 178-79.]

Ultimately, Ragsdale accepted the Meridian position on June 22, 2017, and she began working for Meridian on July 17, 2017. [*Id.* at 178-79, 199.] At Meridian, Ragsdale

would be paid $80,000, with a salary review after six months and a possibility to move up to $85,000. [*Id.* at 204-05.] This was higher than her salary at Beacon, which was $70,000. [DE 33-3 at 31.]

**Discussion**

Generally speaking, there are two theories of recovery under the FMLA. First, there are FMLA interference claims. These occur when an employer interferes with an employee's efforts to take advantage of the FMLA. To pursue an interference claim, a plaintiff must show, among other things, that she applied for, but was wrongly denied, FMLA leave. *Pagel v. TIN Inc.* 695 F.3d 622, 627 (7th Cir. 2012); *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). Ragsdale makes no claim that her efforts to use FMLA were interfered with in any way. The second theory of recovery is under a retaliation theory. In a retaliation claim, the plaintiff must show that an employer took an adverse employment action after the plaintiff exercised her rights under the FMLA. In other words, the Act prohibits employers from using an employee's decision to take leave in promotion, termination, or other employment decisions. *Pagel*, 695 F.3d at 631.

Ragsdale filed a brief state court complaint on February 20, 2018, and the case was removed to me in March 2018. The slim 3-page complaint does not delineate separate counts, but instead seems to state claims that all arise under the FMLA for retaliation (including failing to promote), harassment, and constructive termination. [DE 5 at ¶¶ 19, 22.] Beacon filed the instant motion for summary judgment on November 18, 2019. In her response brief, Ragsdale failed to address a number of

7

arguments raised by Beacon.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Seventh Circuit has recognized that employment cases do not require a heightened pleading standard. *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001).

### A.  FMLA Retaliation Claim — Failure-To-Promote

The FMLA affords protection to employees who are retaliated against because they exercised their right to take leave. 29 U.S.C. § 2615(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." Additionally, 29 U.S.C. § 2615(b) makes it unlawful to "discharge" or "discriminate" against a person for taking part in proceedings or inquiries under the FMLA. As mentioned, the Seventh Circuit has construed these provisions as establishing a cause of action for retaliation under the FMLA. *See, e.g., Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008) ("[i]n addition to the substantive guarantees contemplated by the Act, the FMLA also affords employees protection in the event that they are retaliated against because of their choice to exercise their rights under the Act."); *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005).

8

To establish a claim for FMLA retaliation, Ragsdale has to show: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018); *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). Generally speaking, a plaintiff claiming FMLA retaliation may make her case under the same direct or indirect methods of proof that is utilized in Title VII cases. *Smith v. Hope Sch.*, 560 F.3d 694, 702 (7th Cir. 2009); *see also James v. Hyatt Regency Chicago*, 707 F.3d 775, 781 (7th Cir. 2013). Yet ultimately, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). I must consider the evidence as a whole and determine "whether a reasonable jury could draw an inference of retaliation." *King*, 872 F.3d at 842 (citing *Ortiz*, 834 F.3d at 764-66).

Ragsdale does not provide *any* legal argument on the failure-to-promote claim, especially on the issue of causation. In its reply, Beacon argues that Ragsdale has waived her failure-to-promote retaliation claim because she has not developed any factual or legal arguments to support it. [DE 40 at 2-3.] A non-movant's failure to address claims in response to a motion for summary judgment waives those claims. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned); *Laborers Int'l Union of N. America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived). Ragsdale fails to address, much less include any legal argument,

9

about her claim for failure-to promote in retaliation of her taking FMLA leave, so this claim is waived.

But let's set aside the waiver. Summary judgment is still appropriate on the failure-to-promote claim. Recall that Hartzell, the executive director responsible for the promotion decision, did not even know that Ragsdale had taken FMLA leave when he offered the job to another candidate. *See Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 351 (7th Cir. 2009) (retaliatory animus could not be imputed to the executive director who made the ultimate decision to terminate employee because he "did not know that [plaintiff] took FMLA leave.").

What's more, Murphy was the leading candidate all along, and according to Hartzell, he had more relevant experience than Ragsdale. Although Ragsdale's statement of facts highlights her seniority, Beacon hired Ragsdale on March 24, 2014, and hired Murray on August 10, 2015. [DE 33-4 at ¶ 7.] Such a small difference in seniority does not rise to the level where it "jump[s] off the page" and "there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1179 (7th Cir. 2002) (quotation omitted). Ragsdale's own opinion that she was more qualified is not enough to defeat summary judgment. *See Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("a plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions."). Consequently, the motion

for summary judgment on the retaliatory failure-to-promote claim is granted.

## B. Claim for Harassment in Retaliation for Taking Leave

Setting aside the issue of constructive discharge, which I will analyze in the next section, summary judgment is warranted on Ragsdale's claim for retaliatory harassment because she received no demonstrable injury or prejudice from Beacon's actions.

The Supreme Court addressed this situation in 2002 in a case where, coincidentally, the plaintiff was also named Ragsdale. In that case, the Supreme Court held that the FMLA affords no relief "unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B)." *Ragsdale v. Wolverine World Wide, Inc.* 535 U.S. 81, 89 (2002).

I considered this same issue in *Parker v. Zimmer, Inc.*, No. 3:06-cv-767 PPS, 2008 WL 2945953 (N.D. Ind. July 24, 2008). In *Parker*, with guidance from other cases that in turn relied upon *Ragsdale,* I recognized there are three forms of remedies available to an employee if an employer violates her FMLA rights: (1) she may obtain compensation for wages, salary, and benefits lost "by reason of the violation," 29 U.S.C. § 2617(a)(1)(a)(i)(I); (2) she may get compensation for any actual monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(a)(i)(II); and (3) she is entitled to "appropriate" equitable relief, including employment, reinstatement, and promotion.

11

§ 2617(a)(1)(B). *Id.* at 7. "Summary judgment is appropriate against an employee seeking FMLA claims where none of the three remedies are applicable." *Id.* (citing *Harrell v. U.S. Postal Service*, 445 F.3d 913, 928 (7th Cir. 2006); *Cianci v. Pettibone Corp.*, 152 F.3d 723, 728-29 (7th Cir. 1998)).

In this case, even taking the facts in the light most favorable to Ragsdale and assuming she was harassed by Finkler, Ragsdale does not show any prejudice from the harassment. Although the complaint seeks "compensatory damages," the alleged harassment did not result in any lost wages or other monetary losses under §§ 2617(a)(1)(A)(i)(I)-(II), because Ragsdale kept her job until she left for other employment that paid just as much (actually her salary was higher with Meridian than Beacon). [DE 5 at 3.] The complaint does not allege any actual monetary losses she sustained as a direct result of the violation, nor does it seek any equitable relief like reinstatement. *Id.* Because the allegations of retaliation and harassment did not result in any demonstrable loss for Ragsdale, such allegations "stand outside the remedy provided for by FMLA" and summary judgment is appropriate. *Parker*, 2008 WL 2945953, at *8 (citing *Lakes v. Colgate-Palmolive Co.*, 2008 WL 833241, at *13 (S.D. Ind. Mar. 27, 2008) ("[t]he FMLA does not protect against a violation that has no recoverable damage or equitable relief.").

Aside from Ragsdale's requested relief which is deficient, there is a potentially bigger issue that Becaon has identified. It is unclear whether the FMLA even allows for a cause of action for harassment or hostile work environment — the FMLA and the implementing statutes don't mention the availability of such a cause of action, and I can

find no Seventh Circuit case wherein the adverse employment action in an FMLA retaliation claim was in the form of severe or pervasive harassment. Ragsdale does not respond to this argument, and I don't need to go down this rabbit hole either. I've already found the allegations of retaliatory harassment don't show any prejudice and fail to request remedies under the FMLA, so the claim for FMLA harassment fails as a matter of law.

C. **FMLA Retaliation – Constructive Discharge Claim**

Under the constructive discharge doctrine, an employee is not fired, but instead quits under "circumstances in which the working conditions have made remaining with this employer simply intolerable." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir 1998). The Seventh Circuit has already found that "a reasonable employee would not have considered a failure to be promoted an event that made her working conditions intolerable." *Id.* at 956; *see also E.E.O.C. v. Sears, Roebuck & Co.,* 233 F.3d 432, 440-41 (7th Cir. 2000); *Herrnreiter v. Chicago Hous. Auth.,* 315 F.3d 742, 745 (7th Cir. 2002) (employee's "purely subjective preference for one position over another" does not amount to a constructive discharge.) So the only way this claim survives is if Beacon made Ragsdale's working conditions so deplorable, that she had no other choice but to resign.

"Generally, to support such a claim, a plaintiff's working conditions must be even more egregious than the high standard for hostile work environment claims, because, in the ordinary case, an employee is expected to remain employed while

13

seeking redress." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (emphasis added) (citation omitted). An employee can be constructively discharged "only if the underlying working conditions were themselves unlawful." *Gawley v. Indiana Univ.*, 276 F.3d 301, 315 (7th Cir. 2001). Moreover, the plaintiff "must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her resignation was an appropriate response." *Tarpley v. City Colleges of Chicago*, 752 F. App'x 336, 347 (7th Cir. 2018) (quotation omitted).

Ragsdale argues she was compelled to resign because of (1) management's indifference to her reports of Finkler's harassment; and (2) the harassment itself. Here, Beacon was not indifferent to Ragsdale. Representatives of Beacon met with Ragsdale on several occasions and in June 2017 offered to move Ragsdale to a different HR business partner role, with no disruption to her current pay or benefits, where she would no longer report to Finkler. *See Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) ("the employer can avoid liability for coworker harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring").

This might not have been the exact "fix" Ragsdale was hoping for (which apparently would have involved changing the behavior of Finkler somehow), but it would have removed Ragsdale out of the toxic situation. The fact that Ragsdale turned down this option seems to indicate that her working conditions could not have been

14

that bad. The Seventh Circuit has required a constructive discharge claimant to show that "quitting was the only way" to "extricate herself from the intolerable conditions." *Gawley*, 276 F.3d at 315. Here, quitting was not the only way to get away from Finkler — Ragsdale could have accepted the offer to transfer to a position with a different boss.

In looking at the level of harassment required, the Seventh Circuit has found constructive discharge when there is a threat to a plaintiff's personal safety. *See Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (constructive discharge claim where supervisor brandished a firearm and held it to plaintiff's head); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989) (overruled in part on other grounds) (finding constructive discharge where the employee's human resources manager repeatedly showed her racist pornographic photos and made threatening comments, including a threat to kill her).

Let's look at the facts taken in the light most favorable to Ragsdale in this case. She claims Finkler became passive aggressive after her leave, she gave Ragsdale glaring looks, and made comments under her breath. [DE 39-1 at 93-94.] Sometimes Finkler walked into Ragsdale's office when she was in the middle of a conversation and belittled her in front of clients and humiliated Ragsdale. [*Id.* at 94.] According to Ragsdale, after she had meetings in which she complained to Eller or Hartzell, Finkler would leave her alone for a while, until she called her into a meeting to discuss Ragsdale's complaints. [*Id.* at 95.] Finkler "beat [Ragsdale] down" in the meetings, which Ragsdale described as she acted surprised Ragsdale had talked to management

15

about her again, and Finkler didn't understand where the complaints were coming from. *Id.* Ragsdale said it wasn't uncommon for her to leave these meetings "broke[n] out in hives, balling [her] eyes out." [*Id.* at 95-96.] In total, Ragsdale complained to either Hartzell or Eller approximately four times between September 2016 and January 2017. [*Id.* at 122-23.] Ragsdale said the passive aggressive behavior was ongoing, and never stopped. [*Id.* at 128.]

There is one statement that Ragsdale cites as a verbal threat, but is unclear to me exactly what occurred or what was meant by it. Ragsdale testified in her deposition there was a time when Finkler was in her office and there was a manager and employee standing at the front desk having a conversation about an employee situation that Finkler could not clearly hear. [DE 39-1 at 136.] The employee asked Ragsdale if she could help, and as they were discussing the situation, Finkler walked out of her office, walked by the two of them, and looked at Ragsdale and said, "you better watch it." [*Id.* at 136.] When Ragsdale asked Finkler what she meant, she said, "[w]ell, you just better watch it with her." [*Id.* at 137.] While Ragsdale felt threatened by this statement, she also conceded in her deposition she "didn't know what [Finkler] meant by it." [*Id.*]

There is also one time that Ragsdale claims she was physically intimidated by Finkler. This is what Ragsdale said about it:

> I felt threatened by her. I mean, there was - - and one of the last
> things that pretty much pushed me over the edge was when she
> had me and another employee, LeMila Booker, physically cornered
> in the HR office. My office door was locked and shut. She came
> out of her office. LeMila - - and I was trying to open my door to
> have a conversation with LeMila about her pay increase, and

16

> [Finkler] didn't, apparently, like what I was sharing with LeMila about the pay structure and came out. And she physically had the two of us pinned in the corner. . . . We couldn't get in my office. I was still - - so we were pushed up against the door and the corner of the wall.

[*Id.* at 149-50.]

I readily admit that it seems like Finkler could use a crash course in employee relations. After all, she's a *H.R. specialist*! Nonetheless, I don't think the passive aggressive behavior, comment of "you better watch it," and on one occasion cornering Ragsdale and another co-worker up against a door and the corner of a wall constitute "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).

Nothing in *Boumehdi,* requires a different result. In that case, the plaintiff was subjected to egrigious harssment based on sex, but the harassment was a completely different level than here. In *Boumehdi*, the employer made at least 18 sex-based comments over a period of 10 months, including things like "remain in that position" and "it was perfect" when she was bending over while doing her job. *Boumehdi*, 489 F.3d at 786. He also threatened plaintiff by warning her "that if she didn't watch it, she'd be scrubbing the floors and doing the toilets" after he discovered she had complained about him, and he changed her schedule, shorted her pay, and gave her the worst performance review of her career. *Id.* at 786-87. The Court concluded plaintiff was constructively discharged because the conduct was intolerable, the employer made no attempt to remedy the situation despite her repeated complaints, and this would

17

cause a reasonable person to feel as if they had no choice but to resign. *Id.* at 789-90. The harassment in this case is much, much less severe and egregious than that in *Boumehdi*.

An objectively reasonable person would not have considered Ragsdale's situation intolerable. Indeed, actions speak louder than words. Ragsdale started inquiring about jobs as early as January 2017, and when she was approached by her subsequent employer, Meridian Title, in June 2017 for a prospective position, she responded she had "not been hitting it really hard because I am kind of picky" and stated, "I am at 70K now but would need between 80K-85K to make a move." [DE 33-3 at 31.] The fact that Ragsdale was negotiating for a bump in salary for a position that she wanted to make sure made her happy belies any allegation that her current situation was intolerable and she was forced to quit. *See McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (stating the plaintiff "must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her resignation was an appropriate response."); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (finding summary judgment warranted on constructive discharge claim where employee "left voluntarily several months after filing his last EEOC complaint and after having secured a comparable job elsewhere").

Summary judgment is therefore appropriate for the constructive discharge claim. Ragsdale has not demonstrated that her working conditions were so intolerable that she

was forced to resign. Rather, although Ragsdale was clearly not happy with the current situation, she turned down a reassignment and instead chose to voluntarily leave and join another company in a leadership role.

**Conclusion**

For the reasons set forth above, the Motion to Strike [DE 42] is DENIED. The Motion for Summary Judgment [DE 31] is GRANTED and the Clerk is ORDERED to DISMISS THE COMPLAINT WITH PREJUDICE. Finally, the Clerk is ORDERED to CLOSE this case.

SO ORDERED.

ENTERED: April 13, 2020.

        /s/ Philip P. Simon
        PHILIP P. SIMON, JUDGE
        UNITED STATES DISTRICT COURT